Okay, if council are ready, let's move on to ferrets and prairie dogs. This is 23-8081 Western Watersheds Project v. Vilsack. Ms. Baxson? Correct, Your Honor. Good morning. May it please the court, my name is Megan Baxson. I am here on behalf of Western Watersheds Project, Rocky Mountain Wild, and Wild Earth Guardians. I'd like to reserve four minutes for rebuttal. I'm going to begin today with our Section 7A1 claim and move into our NEPA hard look claim after that. Section 7A1 of the ESA requires all federal agencies to pursue conservation until conservation is achieved. And the context of this case is highly important because the Thunder Basin is absolutely necessary for black-footed ferret recovery. It is the only large prairie dog colony in all of Wyoming and is one of just two reintroduction areas that the Forest Service manages its entire better-than-4-million-acre Great Plains Holdings. And critically, it is also black-tailed prairie dog colonies. Black-tailed prairie dogs are themselves highly rare in Wyoming. They occupy only 0.1% of their former habitat in the state. And they have been characterized by Fish and Wildlife Service as the key species for black-footed ferret recovery. In recognition of how vital this area is, the Forest Service has managed it for black-footed ferret reintroduction since 1981. That meant that poisoning and recreational shooting were largely prohibited and plague mitigation was administered annually, or at least it was until 2017. But the 2020 amendment fully removed this conservation management scheme and instead introduced a host of recognized threats to black-footed ferret recovery. Now the Forest Service has argued first that it owes no duty to the black-footed ferret because it is not currently present on the Thunder Basin, and second, that even if it does owe a duty to the black-footed ferret, that it has more than achieved that duty at a different reintroduction site in an entirely different state. One reintroduction site only. So as to the first, regarding the presence of the ferret, this is a convenient litigation position. It has not ever been held by the agency before, and that is evident in pretty much all of the record that you have before you. You can find it in Volume 1 at 164, 175, 196, Volume 2 at 214 through 215, 218, 246. It has held this position that this area must be conserved for black-footed ferret recovery and furtherance of its conservation duty. The ferret has been reintroduced in a colony in South Dakota, right? Correct. And the agency in charge of the species introduction is Fish and Wildlife? I think you're thinking of Kanata Basin. What? Kanata Basin in South Dakota. Okay, yeah. I just want to get to the duty and what the scope of the duty is, because the plan that was approved here does, according to the record, allow enough acreage for ferrets to be reintroduced at some point by the agency that has that responsibility. Is your complaint here that there's not enough acreage set aside, or is it something else? This was an error at the district court, too, because the acreage is not the only factor here. It doesn't really matter how much acreage you provide them if that acreage is like a war zone. There is plague mitigation that's being withheld, recreational shooting is allowed annually, and poisoning happens throughout the entire reintroduction area. Each of these things alone are an identified threat to black-footed ferret recovery, and in combination, this is more to a hard-look claim, but in combination, the Forest Service has previously said no less than three times that this combination of things can lead to the extirpation of the black-tailed ferret dog, which is the species that the black-footed ferret is entirely reliant on. So looking only to the acreage ignores a critical component of how that acreage is managed. Well, let's focus on the acreage for just a minute. I think, what are they going to 10,000 now? That's the maximum. And that even under the prior plan was permitted, right? No, under the prior plan, the 2009 amendment was the prior plan that was covering and had several categories of prairie dog acreage, but the one that most overlapped with the reintroduction area required 18. Yeah, but they had the option to go down to 10, didn't they? They did not, Your Honor. Okay. Could you explain very briefly the relationship between acreage and population? The acreage objective, prairie dogs are generally measured by acreage objective rather than an actual population count, so the acreage they'll measure it by an acre instead of doing an actual population count. Does that answer your question? Is it sort of a proxy then for population? I think it could be used as a proxy. I'm not entirely sure what the correlation between an acreage amount and the number of prairie dogs on it would be. I don't think that's anywhere in the record. But they do use it as a proxy for the ferrets, right? Didn't they say 30 now was the maximum that this could support? That's correct, Your Honor, and that's actually another point that I wanted to make was that this amendment from 2020 admits that it forecloses meeting one of Wyoming's reintroduction objectives, recovery objectives, and that is housing a population of 100 or more breeding adult ferrets. That was previously forecloses, I guess the question is, if they do this and they introduce 30, are they saying they'll never do a larger population or introduce more? My question being basically, can they do it in pieces? It would require another plan amendment. They no longer have enough acreage to maintain the size that they would need for a population of 100 breeding adults, and so if they were ever to increase it, it would require another plan amendment. So not under the current plan. Why is a management area of 10,000 acres inadequate to fulfill their duty under the ESA? Again, Your Honor, it's because of the type of management. This is critically important here. Each one of these things, as I mentioned, is a recognized threat to black-footed ferret reintroductions. So if the acreage may be enough to support 30 ferrets in isolation from all of this, then this would be an entirely different question, but you can't divorce the amount of acreage that they're retaining with the management of that acreage. And each one of these things has been discussed at length in both the 2013 recovery plan and the 2019 species status assessment. It's the impacts that they have on black-footed ferrets. In fact... But as I understand the plan, I think this is what Judge McHugh was saying, the plan does permit enough acreage to support at least 30 adult ferrets if and when the service ever gets around to a reintroduction plan. That's only if you look at the acreage, Your Honor. All of these things, these new management actions may work to preclude ferret reintroduction, which is actually a determination of the Forest Service has already made in those three prior plan amendments. In their scientific judgment, the plan does permit for some reintroduction population. We're on an arbitrary and capricious review on the APA side, but I mean, it sounds like a lot of your complaints is really hypothetical, that maybe they'll kill too many prairie dogs or maybe they'll use too much poison on an acreage that doesn't have any ferrets at this point. What was the mistake that they made? I have to disagree with you there, Your Honor, because their scientific determination is, if you can call it a scientific determination, directly at odds with three prior plan amendment determinations that are highly relevant here, particularly the 2013 viability analysis, which the Forest Service put together in answer to the identical management scheme that we see here. And that 2013 viability analysis found that in combination, this management scheme has the potential to extirpate black-tailed prairie dogs and will preclude black-footed ferret reintroductions. It made the same conclusion in 2009 when it looked at Alternative 3. Alternative 3 was heavily relying on rodenticides and put in a half-mile boundary around the Thunder Basin. Again, the Forest Service concluded that this would preclude black-footed ferret reintroductions. My understanding was that the 10-J plan was the evaluation that was going to determine that. Is there anything in the amendments that's inconsistent with the 10-J plan? The 10-J plan sets a floor. The 10-J plan is meant to identify new reintroduction areas. There is simply nothing in agency discretion that allows them to look at something that is the floor and take management of an extraordinarily rare and vitally needed reintroduction area to lower it down to a minimum. That is not what the recovery mandate requires from the ESA. The recovery mandate from the ESA requires that we pursue conservation until conservation is achieved, and we do not do that by lowering management to a point where this area is inhospitable to the species we need to reintroduce there. So then the correct legal outcome here should have been that the agency selected Alternative 1, no action. Would that be a W for Western Watersheds? It would, but I think, you know, in addition to that, the range of alternatives that we see here doesn't include a vital concept, and that is what could they have done to achieve both their recovery mandate and conserve the species and change management in whatever way they needed to, and that might have been a change to grazing. So I want to note that, yes, Alternative 1 would have been good, but we had probably many other alternatives that I myself am not aware of and cannot explain to this court, because none of us are the experts here, that went unanalyzed simply because they decided that lethal control was the only mechanism that they were going to consider. Did you raise grazing below? Grazing, you're asking about forfeiture, correct, Your Honor? I am. Okay. The argument about changing grazing is not necessarily as precise as the state and the agency would like you to believe. It is still the same argument that there was not a reasonable range of alternatives, and I can make that argument about grazing because the Forest Service has set this up as a binary choice. Either we preserve prairie dog colonies, or we work to increase forage for livestock grazing. So why then was there no alternative that considered conserving prairie dog colonies in order to both fulfill their conservation mandate, and not in conflict with their NIFA multi-use mandate? Well, I think the answer to that that they gave was that it's outside of their consideration to manage those grazing permits. That is correct, and that is why I think back country against dumps, one of the cases that we cited in briefing, is pertinent here and merits some consideration, because the agency in that case also said that the distributed energy alternative was outside the scope of their amendment, but that court found that they should have considered it. Well, in those cases, I think you actually cite two cases that are kind of similar, there where they considered a single vendor. One was a water case, and they considered only one provider of the water, and on this one again, they considered just one third party in that case as well, right? The Simmons case is a case on purpose and need. It's about setting too narrow a purpose, which is another argument that we made here, but the relevance of that case is that if you constrain the purpose so narrowly, i.e. one water provider or only lethal management, then you set a purpose and need that ultimately results in a range of alternatives that are too narrow, as it did here, and I'd like to reserve the rest of my time. Thank you. So you're gonna try to split your arguments between the federal and state defendants, right? Good luck. I'll try to help you out. When do you want to stop? Yes, Your Honor. May it please the Court, Amy Collier on behalf of the federal defendants. I plan to speak for 13 minutes and reserve two minutes for Mr. Jordan representing the state of Wyoming. I'd like to start by sort of breaking down what the claims are for the Section 7A1 claims that brought here today. I think there are two sort of issues there. There's what the statute requires the agency to do, but then there's also some helpful factual context in terms of what this actual plan amendment did. So to start with the statutory language itself, the statute requires federal agencies to carry out programs for the...utilize their authorities to carry out programs for the conservation of listed species in consultation with the Fish and Wildlife Service. As Fish and Wildlife has determined in its regulations, as other courts have recognized in the few cases where this has arisen, agencies have quite a bit of discretion in determining how best to fulfill that conservation duty. And it, you know, it stands in contrast just looking at the statute with Section 7A2, which applies specifically to agency actions. Whenever an agency acts, it's supposed to undertake this consultation process if there's a risk of effects to listed species. But Section 7A1 doesn't apply to agency actions. It tells agencies to look at their conservation duty when carrying out programs. And courts have recognized that that means that the agency can't do nothing. It means that the agency can't rely on its other statutory obligations and say that we have no conservation duty because we have these other obligations. Could I just ask you on 7A1, has the Tenth Circuit looked at the scope of 7A1? The Tenth Circuit has not. There was a Wyoming district court case, Coalition for Sustainable Resources, where the district court ruled on that. But when it came up to the Tenth Circuit, this court vacated that decision, I think on rightness grounds. So I don't think this court has squarely addressed that question. But the courts that have addressed it have looked specifically and said that there's that discretion there for an agency to determine how to carry out that duty. And in terms of... Can you clear up one point on that? Is it your position that the service had no duty to evaluate Thunder Basin for ferret recovery? I think, you know, because Section 7A1 doesn't speak to specific actions, it doesn't require every action an agency take to necessarily be one for conservation, but that you must look a little bit more broadly at what an agency is doing to fulfill that conservation duty. So here the Forest Service does things in other contexts to support ferret recovery. It works closely with Fish and Wildlife. It has other reintroduction sites. It's working on identifying other places to reintroduce ferrets. So I don't think you can look just so narrowly as what is happening here. But that leads me to my second point, which is more the context and facts that issue in this case. Appellants, as they said today at oral argument and they say in their briefs, would much prefer the Forest Service have adopted the no-action alternative and maintained what was in place from the 2009 plan amendment. But as the Forest Service repeatedly recognized in their EIS and in the record of decision, the prior version of the plan did not support ferret recovery. Both because it did not maintain a stable prairie dog population. The recent experience with the rapid explosion in prairie dog population size and then rapid decline from plague really epitomized that. Well one of the responses they make to that is that there was no attempt to mitigate the plague. Yeah and I think this actually just highlights one of the issues that the Forest Service faced with the prior version of the plan. So if you look at the prairie dog numbers as they were growing so rapidly in 2015, 2016, 2017, these colonies were growing by tens of thousands of acres. And by the time 2017 rolled around, the Forest Service was dealing with widespread issues with encroachment onto non-federal land. And it made the decision to use its resources to address that pressing issue with the issues that prairie dogs cause to infrastructure, the hazards they may create on private land, rather than using the resources to potentially treat a couple thousand acres for plague. But at the same time, I will emphasize that the Forest Service was treating the reintroduction site at Kanata Basin for plague. It wasn't abandoning, you know, its duty to manage for this species. But it really showed the inflexibility of the prior plan and the inability for the Forest Service to maintain this manageable prairie dog population size ahead of time, deal with encroachment ahead of time, and really left the Forest Service struggling as this plague outbreak came about. So in terms of what the new plan amendment does, is it again maintains an acreage, prairie dog acreage objective that is well above the amount that Fish and Wildlife has recognized is needed for a reintroduction site, which is 1,500 acres, well above the amount required for 30 ferrets. And also provides other sort of components that Fish and Wildlife has recognized are important for any reintroduction site, both in its recovery plan for the ferret and in for the 10-J rule for Wyoming itself. Can I just jump in? I've been interested that both of you started today with the ESA 781 issue, and you didn't, neither of you started with the NEPA issues. But if there's a problem on the NEPA issues for you, in other words, if we were to find that the purpose of needs statement is too narrow, the range of alternatives, insufficient range of alternatives, you fail to take a hard look, do we even get to the 781 issue? I mean, it depends what the breadth of the court's decision there would be. I mean, if the court is deciding that the Forest Service needs to, you know, go back and do different analysis under NEPA, that's not necessarily an outcome determinative decision. Well, why not? How can we evaluate whether the government satisfied the conservation mandate if, for example, it to take a hard look at the combined effects of these management controls? I mean, how can one even do a meaningful analysis if that's the case? So, I think it would be hard for this court to say that the conservation duty was not satisfied when the Forest Service... That wasn't my question. My question is, could we even say one way or the other whether the conservation duty was satisfied? I wouldn't think so because, again, that involves sort of a technical evaluation of what the agencies are looking at. I do want to address the NEPA question if we want to get there to the hard look analysis because I think that is what the court is most interested in. Well, I'm really interested in something that nobody talked about, and I'm going to just say it briefly, but in looking at the EIS, there's actually two sets of purpose and needs lists. One is in the narrative part of it, the text part of it, and there's a different list in the table, table 4, and why isn't that a problem for you? I don't know specifically what... Well, I'll tell you, I think there's a pretty significant listing in table 4 which says refocus management in management area 3.67 to de-emphasize black-footed ferret reintroduction. That was nowhere in your text list of purpose and need. So there's an inconsistency in the EIS that seems to be pretty material. So I think that speaks specifically to the purpose of re-evaluating the management direction for this management area. But it wasn't in the list, and there it is here. What are we supposed to do with that? I think that does fall under the purpose of sort of revisiting that management directive, and that speaks, you know, in potentially different terms in that other list. Well, somebody didn't proofread the table because it's not the same as what's in the text, and here we are having to deal with that. I would point out the plaintiffs don't make that argument. I understand that. It troubled me to see that. I understand, Your Honor. Because they have made the argument that the purpose and need statement is too narrow, and why isn't it? Especially the need about the availability of more lethal control and nothing about grazing. Certainly, Your Honor. So a couple of points on that. I think here we have, you know, unlike the Simmons case, unlike some of the other cases that appellants cite, we have the Forest Service has many, many years of experience with what is the prior version of the plan with the no-action alternative, and determined that that just did not provide the flexibility to respond quickly and efficiently, effectively, to various issues that arise. The Forest Service talks throughout the EIS about the other non-lethal control measures and how they are ineffective and have limits to their use. That's the EIS supplemental appendix 36, 76, 468. It talks specifically about the costs associated with the non-lethal measures at 131. It talks about how vegetation barriers, which is somewhat related to the grazing component. I'm still, I'm not getting your point. What is the point you're trying to make? So the point is that the Forest Service had experience with a version of the plan that allowed for all of those non-lethal control measures, and that did not provide the ability to respond quickly, especially with in allowing more lethal control tools. As I understand it, the purpose and need statement sets the meets and bounds for the range of alternatives. You have more lethal controls in every alternative. Isn't that an indicator that it's too narrow? Well, more lethal controls under each alternative, but to differing degrees, different thresholds, and different types of lethal control measures. But I would emphasize again that all of the non-lethal control measures remain available under all of the alternatives, and the Forest Service will continue to consider using those under the selected alternative. It comes across that really what we're talking about here is, let's allow more poison and recreational shooting. I don't think that's fair, Your Honor. I think what the Forest Service looked at was... Well, it's in every alternative. Well, no. So recreational shooting is prohibited in the management area under Alternative 4. Alternative 4 also has much greater restrictions on the use of rodenticides, higher thresholds for their use, don't allow fumigants in boundary zones. So there there are differing... You're running out of time, and you wanted to say something about hard look. Yes, I will address that. Let me focus you a little bit, because I've got a problem with the hard look at the combined effects of poisoning, plague, recreational shooting, and there's a citation that allegedly is, say, where you say there's support that you took a hard look. We've looked at that citation. It doesn't support it. So if you can give us a 28-J where you think you took a hard look at the combined effects, I would be happy to see it. Sure. So the impact analysis for prairie dogs specifically is an Appendix E. It starts at EIS Supplemental Appendix 732 and goes about 20 pages. The determination in the rationales, which look at... it specifically says the combined effect of these alternatives, of these planned components, is at 751. But in the pages before that, when the Forest Service is looking at the various specific components, so for example, recreational shooting at 744, as well as 736, it's looking at the studies that have evaluated recreational shooting. It's also looking at Fish and Wildlife's own determination in 2009, which it cites there, and which itself looks at the impacts of recreational shooting, and looks at the impacts of these activities, and determine that even in states where recreational shooting is allowed, where on grasslands where it happens, prairie dog populations continue to expand. And these are all individually looking at recreational shooting, or looking at the poisoning, or looking... what I'm looking for is a hard look at the combined effects of all of those, because in the prior reports, that was a concern. Yes, your Honor, and I would point out that since those prior determinations, there have been additional measures to control plague that have been developed. There have been the Forest Service's own experience on the grassland in 2017 to 2018 to now, where the prairie dog population declined rapidly and has started to rebound again. It's back up to about 10,000 acres in the management area. So it had that experience with the population declining rapidly and increasing, and then the rationales that it provides at 751 are ones that are applicable to each of those components, and continue to provide prairie dog resilience and viability in the face of various threats. The Forest Service recognized that plague, as Fish and Wildlife has also recognized, is the greatest threat to the prairie dog population, and it has, in response to that, developed a particular integrated management approach that is specifically designed to address that, along with the other sort of components of maintaining a more manageable prairie dog population size, and including these sort of I want to push back on the idea that this is open warfare on prairie dogs. There are limits to the use of rodenticide. Did anybody say that? I think Appellants Council did say that this is sort of a war zone for prairie dogs in their argument, and I just want to push back on that. The Forest Service feels very strongly about preserving this habitat for prairie dogs and for the species that depend on it. To Judge McHugh's question on supplementation, if Fish and Wildlife decides to reintroduce ferrets and it's successful, at Appendix Volume 5, page 98, the Forest Service discusses supplementing if that happens, and in terms of how many... Who decides when and where the ferret reintroduction would be? That would be Fish and Wildlife. That is not the Forest Service's decision. It works closely with the state of Wyoming to identify sites that would be receptive to it, but it's Fish and Wildlife's determination, and again, Fish and Wildlife has been working on rebuilding this ferret population for decades. It's not going to put a hundred of its precious resources in one location without establishing that there's a stable prairie dog population, there's boundary control, there's plague management, which is all of the things that this plan amendment does. Just to Judge Matheson's question, I think there's about 10 to 20 prairie dogs per acre is my understanding of the amount. That's the conversion? Yeah, and I don't have the site in front of me, but it is in the IS. Okay, thank you. We took most of Wyoming's time, so Mr. Jordan, you can have two minutes. Can you give him two? Thank you, Your Honor, for your... Hold on, let's get... Of course. All right, whenever you're ready. Thank you, Your Honor, for your generosity. Travis Jordan for the state of Wyoming. For the past nine years, under the 10-J rule, the state of Wyoming, working with the Fish and Wildlife Service, has been reintroducing ferrets across the state of Wyoming. That rule here is relevant for the Section 7 question. I prefer to use my limited time to talk about two things and clarify things that were said by the appellants. First and foremost, the appellants, when referencing the 100 ferret recovery goal, are confusing recovery with reintroduction. Black-footed ferret recovery is a marathon. It is not a sprint. As Arad explains at page 8, the goal is to start with 30 ferrets. The continual reference is to the Kuntana Basin. Keep in mind that that 10-J rule for South Dakota has been in place for almost three decades. They have a 20-year start on the Thunder Basin. The goal in Wyoming zone ferret reintroduction sites, both of which are on the western side of the divide, the Shirley Basin has been developed for almost three decades. The point being is that the Forest Service, the state of Wyoming, and the Fish and Wildlife Service start small, and they need to start small. The last thing is the appellant suggestion that the Thunder Basin is the only location in which black-tailed prairie dogs are capable of supporting ferrets is a little disingenuous. I'd encourage the court to look at the appellant's record at volume 2, page 244, which identifies six to eight sites across eastern Wyoming where black-tailed prairie dogs could be capable of supporting reintroductions, as well as the distribution map in the state of Wyoming's map, the supplemental 2016, we will go over 200,000 acres of black-tailed prairie dog populations in eastern Wyoming that might be able to support a reintroduction. With that, Your Honor, the state would like to join the Forest Service in asking this court to affirm, and thank you for the opportunity to provide it. Counsel, we appreciate your succinct statement, and a little bit of rebuttal time for Ms. Baxton. First, I would like to note that I agree with this court in its assessment that there is no combination. There is no analysis of the combination of these threats, and I don't feel like any of the sites that have been given to you have that combination in it. I have indeed read through the entire EIS, and I have not found it myself. Quick question about purpose and needs. Your focus is on the purpose of control's need, but there's, what, three needs and four purposes, or two needs, and anyway, that isn't the only listed need. Why, if you've only focused on that one, why is the purpose of need statement too narrow? That's where the Simmons case is really helpful, because when you include some aspect of a purpose and need that is too narrow, it augments the range of alternatives that can come out of it, and it indeed ends up defining how something like the third purpose, I believe it was, that was to address resource conflicts between prairie dog occupancy and grazing is decided, and it was decided for livestock grazing interests. It was decided to... How would you respond to Ms. Collier's point that all the management controls are still available? I think in our reply brief, we cite to, and I apologize, I know it's in the brief, but I can't remember the actual site, that non-lethal controls remain available if requested, and this assertion that these non-lethal controls were ineffective is also in itself disingenuous, because they haven't actually enacted the full plan since 2011. 2011 was the last time they tried translocation. There is no evidence in the record that they ever attempted grazing changes, which was another non-lethal component, or vegetation barriers, and in our supplemental appendix in the 2014 Prairie Dog Management document, it talks about a boundary fence that they put in that was highly successful. It did stop prairie dogs from going on to adjacent lands until a permittee required that it be removed. So these non-lethal methods could be very effective. We have no idea. They were never tried. And then the last thing that I really wanted to hit was that the Fish and Wildlife Service recovery objectives do require 10 populations of 100 breeding adults before delisting can be achieved, and that is nationwide, but this area, prior to this management change, could have fulfilled one of those population objectives. All right, Council, thank you. Your time has expired. Councilor excused. We appreciate the fine arguments. The case shall be submitted.